62 308
135 524
62 308
151 303
153 632
62 308
176 32
62 308
25 SC ᶜ 26
25 SC 582
26 SC ᵃ109
62 308
28 SC ᶜ566
f 28 SC ᶜ634
62 308
214 ᶜ459
62 308
215 ᶜ413
62 308
32 SC ᶜ490
33 SC ³193
33 SC ᶜ407
62 308
f218 ᶜ648
62 308
35 SC ᶜ233
35 SC 343
f 36 SC ᶜ566
62 308
40SC ᶜ 16

# Reel *versus* Elder.[1]

1. The injured party in the marriage relation must seek redress in the forum of the defendant, unless where the defendant has removed from what was before the common domicil of both.

2. No one who has not shut himself out by flight from justice can be condemned without hearing or an opportunity of being heard.

3. If a court has not jurisdiction, neither notice nor process duly served can give vitality to its judgments.

4. Such judgment is void, at least as to any extra-territorial effect.

5. A husband went from the domicil of himself and wife into another state, and obtained a divorce; after the decree land vested in him. *Held,* in an action of dower, the fact of the vesting after the decree did not affect the wife's right.

6. However indisputable proof depending on oral testimony may be, it is the province of the jury to decide under instructions from the court.

7. A voluntary separation of the wife from the husband, as well as adultery, will bar her of dower.

8. When one by his words or conduct wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief so as to alter his previous position, he is estopped.

9. A husband living in another state was divorced whilst his wife lived in the original domicil; afterwards she lived with another man as her husband. The husband conveyed land; afterwards the wife declared she was married to the second man. *Held,* in a suit for dower against the purchaser, that she was not estopped from claiming as the widow of the first husband.

10. In an action of dower, it is no defence that the defendant is a bonâ fide purchaser for value without notice.

11. Colvin *v.* Reed, 5 P. F. Smith 375, approved.

May 20th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Dauphin county :* Of May Term 1869.

This was an action of dower *unde nihil habet,* brought July 26th 1867, by Amelia Elder against John Reel, the vendee of John Elder, her husband, to recover dower in a farm which he had aliened in his lifetime. The testimony developed the following facts :—

John Elder, son of Thomas Elder, Esq., late of Harrisburg, on the 7th November 1841 married Amelia Dehart. The difference in the social condition of the parties made the marriage an unhappy one, and they lived together but a short time after the marriage. About two weeks after the marriage, John Elder left, saying that he was going to leave his wife. His mother testified in this case: "John did not want to let his wife know that he was going away; he went away secretly in the cars; he went away as though he was going a-gunning; the reason John went away was that he did not want to live with her, and his father did not want

[1] I am indebted for the report of this case to Wallace De Witt, Esq., of Harrisburg.

the fuss of a divorce here." John Elder went to Clarksville, Tennessee. After he went away the plaintiff Mrs. Elder gave birth to a daughter. John Elder remained in Tennessee twelve years. In 1849, about six years after the desertion, Mrs. Elder had a child by another man in Harrisburg, Pennsylvania. John Elder having heard this, instituted proceedings in divorce in the Circuit Court of Montgomery county, Tennessee. The petition for divorce set out that he had not married with his own consent, but was fraudulently married to her whilst he was intoxicated and unconscious of the transaction; that after the marriage in 1841 he came to Tennessee and had since remained there; that shortly afterwards his wife was guilty of adultery; he prayed that Amelia his wife be made a party to the proceedings, she being a resident of Pennsylvania. On presentation of the petition the Tennessee court ordered that publication of the petition be made for three months in a newspaper published in Clarksville, Tennessee.

On the 17th of January, 1850, the court being satisfied with the publication according to the order, and the defendant not appearing, ordered that the bill should "be taken for confessed and set for trial ex parte."

Mrs. Elder never was out of the state of Pennsylvania, and during the pendency of the proceedings in divorce in Tennessee against her, was a resident of Philadelphia.

A commission to take testimony issued from the court in Tennessee, returnable at Harrisburg, Pennsylvania. The following notice, signed by John Elder, was sent to Mrs. Elder:—

Mrs. Amelia D. Elder—Take notice that on Wednesday, May 1st 1850, I will attend at the office of William Kline, in Harrisburg, Pennsylvania, to take the depositions of Dr. Christian Seiler, Jr., to be read as evidence in a suit for divorce now pending in the Circuit Court of Montgomery county, Tennessee, wherein I am complainant, and you are defendant, &c.

The constable made return under oath "that he had left a correct copy of the notice with James Chester, the brother-in-law of Amelia D. Elder, where the said Amelia had her last place of residence, and learned from him that said Amelia had left, but was expected daily to return to Harrisburg; and also left a copy of the notice with Mrs. Dehart, the mother of Amelia D. Elder." The depositions taken under the commission tended to show the adultery of the respondent.

On the return of the commission with the testimony, the Tennessee court made the following decree:—

"May 16th 1850. This cause came on for final hearing on bill and proof, and it appearing to the satisfaction of the court that complainant had been a resident of this state for more than two years, and the defendant still remains in Pennsylvania, where she has been guilty of adultery since her intermarriage with complain-

[Reel *v.* Elder.]

ant, it is decreed, &c., that the bonds of matrimony existing be-
tween complainant and defendant be and the same are hereby dis-
solved and for nothing held."

In 1853 Thomas Elder, Esq., the father of John Elder, died
seised of a large real estate.   There was evidence that John Elder
returned to Pennsylvania, and met his wife in Philadelphia, called
the Tennessee divorce a nullity, and that they came to Harrisburg
with their child and lived together several months.   During this
time, on January 17th, 1854, the title of the farm in which Mrs.
Elder claims dower vested in John Elder, by proceedings in parti-
tion.   Soon after he again left Mrs. Elder, and lived with another
woman, to whom he was married in Schuylkill county, Pennsylva-
nia, February 4th, 1854.   "John Elder and Jerusha his wife," by
deed dated February 2d, 1856, conveyed the farm in question to
John Reel.

On September 29th, 1856, information was made against Mrs.
Amelia Elder before Justice Reed, for adultery.   She alleged
before the justice that "she was not guilty, for her husband John
Elder appeared as a witness and proved that he was divorced from
said Amelia."   Jerusha died in March 1857.   There was evi-
dence that in the summer of 1857 John and Amelia were re-
conciled, and until July 5th 1860, the date of his death, they lived
in Harrisburg as man and wife.   During these three years after
the reconciliation they had three children, of whom two are living.
Mrs. Elder claimed dower in the farm sold to John Reel, and that
the children of John Elder and herself, born after the Tennessee
divorce, are legitimate.

The court (Pearson, P. J.), after referring to the facts and
discussing preliminary legal questions, charged: ["We are of the
opinion that the divorce decreed by the court of Tennessee effectu-
ally destroyed the marriage contract between John and Amelia
Elder.]

"We come now to another branch of the defence.   At the time
the divorce was granted, John Elder had no interest in the estate
out of which the dower is claimed.   His father died in 1853.
John then returned to Pennsylvania, and now became reconciled
to his former wife; spoke of the divorce as a nullity, and they
lived together for some weeks or months.   She went to Philadel-
phia for some purpose, and the next account we have of her is
that she was living in that city with Pickel, and passing as his
wife.   Mr. Shaffer states that the two—Pickel and Amelia—came
there about the first of April 1854, and lived his next neighbors
for about a year, passing in society as a married couple.   John
had in the meantime taken up with some other woman, and they
resided together on the land awarded to him in the partition, as
part of his father's estate, until he sold to John Reel, the defend-
ant; and he, and his new wife (real or pretended), conveyed the

[Reel *v.* Elder.]

same by deed on the 2d of February 1856. At that time we may fairly infer that Amelia was living with Pickel as his wife, as they were found staying together in that capacity in the spring of 1855 in Philadelphia; and Barbara Bridenbaugh testifies that they came to the tavern kept by her relative in Campbellstown, boarded there for eight months, passed as husband and wife, and Amelia had a child during the time they were there, which both claimed as their own. They said they were married, and had a marriage certificate.

"In the month of September 1856, after the execution of the deed to Mr. Reel, Amelia and Pickel came to Harrisburg, when a prosecution was commenced against her for adultery with Pickel. She then averred that Elder and she were divorced, and sent for him to testify before the magistrate. He did testify that they were divorced, and the prosecution was dismissed. The stat. 13 Edward 1, ch. 34, bars the wife of her dower who goes away and continues with her avouterer, unless her husband be voluntarily reconciled with her, and suffers her to live with him, in which case she shall be restored to her action.

"By the common law adultery was no bar to dower, though in our opinion it should have been, as the wife, by such act, violates her marriage contract in the most essential particular; but this statute is in force in Pennsylvania; and it has been held under the statute that dower is barred by elopement with an avouterer, and even if carried off by force, yet if she continue with him voluntarily she is precluded, nor is it necessary that she should reside or continue with him in order to bar her of her dower. Nothing can restore her right but the voluntary reconciliation of her husband. If, then, this divorce was out of the case, the plaintiff, by her elopement and course of life down to the time of the conveyance to Mr. Reel, would be precluded from claiming dower. [It is said, however, thst she and her husband, Elder, became reconciled, and therefore her conjugal rights are restored. The evidence shows that after this woman with whom Elder was living at the time of the conveyance, and who he claimed to be his wife, died, he again took up with Amelia, and they resided together several years in this city, and had two children; but this occurred some two years after the conveyance of the real estate. We instruct you that such reconciliation will not enable the wife to recover dower out of property which her husband had sold for full value, and conveyed by deed to one who bought, in good faith, during the wife's elopement and residence with her adulterer. The purchaser had no reason to suppose that she and her husband would ever become reconciled, more especially if you believe that Amelia, the former wife, averred that she was married to Pickel, declared that Elder was divorced from her, and brought him forward as a witness to swear to the fact, and he did so testify, and claimed to be married to the woman who joined in the deed

to Reel, the defendant.] For us to hold that the subsequent reconciliation between husband and wife would restore her to a full right in her husband's estate which he had aliened during her elopement, would be to fetter up conveyances in a manner injurious to society. A wife might elope from her husband with an adulterer, and remain absent for twenty years, and if she would then return, and by a reconciliation with her husband entitle herself to an interest in all of the land that he had bought and sold in the mean time, it would enable the two to practice a fraud on society, and involve innocent purchasers in trouble.

["We are of the opinion that, independently of the divorce, the plaintiff, by her course of conduct, is precluded from recovering dower in the present case, and your verdict should be in favor of the defendant."]

The verdict was for the defendant.

The plaintiff took a writ of error. Her 2d, 3d and 4th assignments were the parts of the charge enclosed in brackets.

*W. De Witt,* for plaintiff in error:—The marriage of John and Amelia Elder, the seisin of John Elder in the farm, and his death being proven, the right of Amelia to dower at common law is complete. The decree of divorce between John and Amelia Elder as proven by record from Montgomery county, Tennessee, is null and void and of no effect in Pennsylvania, and can have no extra-territorial operation against Amelia Elder to deprive her of dower as widow of John Elder, because, 1. The court of Montgomery county had no jurisdiction of the party respondent at any time before during the pendency of or after the proceedings in divorce, as the respondent was never out of the state of Pennsylvania. The want of jurisdiction is apparent on the face of the record, and is proven to be true by the testimony; 2. The court of Montgomery county never had jurisdiction of the subject-matter of the divorce: Bissell *v.* Briggs, 9 Mass. 466; Phelps *v.* Holker, 1 Dal. 261; Armstrong *v.* Carson's Ex'rs., 2 Id. 302; Benton *v.* Burgot, 10 S. & R. 240; Dorsey *v.* Dorsey, 7 Watts 350; Steel *v.* Smith, 7 W. & S. 450; Baxley *v.* Linah, 4 Harris 241; Rogers *v.* Burns, 3 Casey 527; Bishop *v.* Bishop, 6 Id. 416; Miltimore *v.* Miltimore, 4 Wright 159; Colvin *v.* Reed, 5 P. F. Smith 375; Hoffman *v.* Hoffman, 55 Barb. N. Y.

Because upon the face of the record it appears that there was no notice to the respondent of the proceedings in divorce within the territorial limits of the *forum* or voluntary appearance by her. The notice of the taking of depositions on a commission served as appears of record is no legal, much less an actual notice to Amelia Elder; and had it been a personal notice, it was not within the *forum* of the court attempting to obtain jurisdiction of the party respondent, and therefore is a nullity: Flower *v.* Parker, 3 Mason

[Reel v. Elder.]

251; Story's Conflict of Laws, chap. 14, §§ 539, 543, 546; Piquet v. Swan, 3 Mason 469; Fenton v. Garlick, 8 Johns. 194; Dunn v. Dunn, 4 Paige 425; Lyon v. Lyon, 2. Gray 367; Arnold v. Tourtelet, 13 Pick. 172; Irby v. Wilson, 1 Dev. & Bat. 568; Borden v. Fitch, 15 Johns. 121; Mills v. Duryee, 7 Cranch 481.

Because the divorce was obtained *in fraudem legis* of Pennsylvania; John Elder maliciously deserted his wife for the purpose of obtaining a divorce in Tennessee. The decree is of no value in the courts of the county whose laws are sought to be infringed: Jackson v. Jackson, 1 Johns. 424; Borden v. Fitch, 15 Id. 145.

The plaintiff is not barred of her dower by her adultery. The evidence shows that she did not elope from her husband, but he from her. In order to bar a widow of dower, proof of adultery alone is not sufficient—she must have left her husband voluntarily. A woman abandoned by her husband and afterwards committing adultery does not forfeit her dower: Thomas's Coke, 703 n.; Green v. Harvey, 3 Bacon's Abr., tit. *Dower*, p. 224; Stegall v. Stegall, 2 Brock. 258; 4 Kent's Com. 53; 1 Roper on Husband and Wife 331; Cogswell v. Tibbetts, 3 N. H. Rep. 41; Walters v. Jordan, 13 Iredell 361; Graham v. Law, 6 Jones's U. C. C. Rep. 310; Shaeffer v. Richardson's Adm'rs., 27 Ind. Rep. 123; Bell v. Nealey, 1 Bailey's (S. C.) Rep. 312; 1 Washburn on Real Prop. 227; Scribner on Dower 498, § 2; 1 Bishop on Marriage and Divorce 628.

Even had she forfeited her dower by her adultery, under Statute of Westminster 2d, the reconciliation of her husband with her, and the subsequent cohabitation, restored to her the right of dower in any lands he held during coverture, although he had aliened them before reconciliation: Coke's Lit. 33, n. 8; Menville's Case, 13 Coke's Rep. 23; Rolle's Abr., tit. *Dower* 680; 1 Lilly's Abr. 669, tit. *Dower* H.; 3 Bac. Abr., tit. *Dower* 224; Perkin's Con., tit. *Dower* 155; Harris v. Harris, 4 Esp. 41; Bateman v. Ross, 1 Dow. 235; Park on Dower *222; Clancy on Married Women 201; 1 Roper on Husband and Wife, pt. 2, 559; 1 Brightly on Husband and Wife 539; 1 Hilliard on Real Prop. 101; 4 Kent *53; 1 Washburn on Real Prop. 227; Scribner on Dower 506; Lakin v. Lakin, 2 Allen 45; Bryan v. Bachseller, 6 R. I. Rep. 546; Lecompte v. Wash, 9 Miss. 557; Hollister v. Hollister, 6 Barr 449; Nathan v. Nathan, 2 Phila. Rep. 205.

*L. B. & Hamilton Alricks*, for defendant in error.—The Tennessee court had jurisdiction to decree the divorce *causa adulterii*, and the decree is valid in Pennsylvania because the husband had resided the statutory period of time in Tennessee to become a citizen; because the laws of Tennessee and Pennsylvania recognise adultery as a cause of divorce, and because the wife had

notice of the proceedings: Bishop *v.* Bishop, 6 Casey 416; Rogers *v.* Rogers, 15 B. Monroe 364; Dorsey *v.* Dorsey, 7 Watts 352; Colvin *v.* Reed, 5 P. F. Smith 375; Hart *v.* Lexas, 21 Wend. 40; Miltimore *v.* Miltimore, 4 Wright 151; Warrender *v.* Warrender, 9 Bligh 89; 2 Kent's Com. 117.

The effectiveness of the above principles depend on the law of comity between the states of the Union.

The Constitution of the United States requires the recognition of the validity of the decree of the divorce: Mills *v.* Duryee, 7 Cranch 481.

The doctrine of marital unity also requires the recognition of its validity: Hollister *v.* Hollister, 6 Barr 451; Green *v.* Green, 11 Pick. 410.

The courts have uniformly held that to entitle a court to jurisdiction in divorce, it is sufficient that one of the parties was domiciled in the country: Harteau *v.* Harteau, 14 Pick. 181; Harding *v.* Allen, 9 Green 140; Tolen *v.* Tolen, 2 Blackf. 407; Hull *v.* Hull, 2 Strobh. Eq. 174; Parson on Cont. 117, note; Bishop on Marriage and Divorce 155.

The plaintiff's acts create an equitable estoppel to her claim: Com. *v.* Moltz, 10 Barr 530; McMahan *v.* McMahan, 1 Harris 380; Schoch's Appeal, 9 Casey 351; Styer's Appeal, 9 Harris 86; Tyson *v.* Passmore, 2 Barr 124; McCullough *v.* Wilson, 9 Harris 436.

The defendant was a bonâ fide purchaser for value, without notice: Ackla *v.* Ackla, 6 Barr 228; Hill *v.* Epley, 7 Casey 334; Martin *v.* Ives, 17 S. & R 365.

*De Witt*, in reply.—The principle of equitable estoppel cannot apply in favor of defendant, as the acts relied on to estop her were *subsequent* to his purchase: Com. *v.* Moltz, 10 Barr 527; Eldred *v.* Hazlet, 9 Casey 316; Brubacker *v.* Okeson, 12 Id. 519; Hill *v.* Epley, 7 Id. 334; Lawrence *v.* Brown, 1 Seld. 394; Cuttle *v.* Brockway, 8 Casey 49.

The plea that defendant is a purchaser for value, without notice, is not a good defence in an action of dower, *unde nihil habet*: Larrow *v.* Beam, 10 Ohio 498; Blake *v.* Heywood, 1 Bailey's Ch. 208; Campbell *v.* Murphy, 2 Jones's Eq. 357; Ridgeway *v.* Newbold, 1 Harrington 385; Jenkins *v.* Bodley, 1 Sme. & Mar. 338; Gano *v.* Gilruth, 4 Greene 453; Wailes *v.* Cooper, 24 Miss. 208; Daniel *v.* Hollingshead, 16 Ga. 190; Attorney-General *v.* Wilkins, 17 Beav. 285; 1 Story's Eq. §§ 630, 631; 2 Scribner on Dower 157.

The opinion of the court was delivered, July 6th 1869, by

SHARSWOOD, J.—The only assignments of error which we will consider are the 2d, 3d and 4th. Those which remain are so

clearly contrary to the rules of this court (6 Harris 578), that we must dismiss them on that ground. Fortunately, however, no injury results to the plaintiff in error, for the only questions which arise on the record are presented in the assignments which are well made.

The first of these questions is as to the effect of the divorce *à vinculo matrimonii* decreed by the Circuit Court of Montgomery county, Tennessee. The court below instructed the jury as follows: "We are of the opinion that the divorce decreed by the court of Tennessee effectually destroyed the marriage contract between John and Amelia Elder." It is probable that the learned judge would not have so held, if, at the time of the trial below, Colvin *v.* Reed, 5 P. F. Smith 375, had been reported, or the decision brought to his notice. That case rules this. It settles that the injured party in the marriage relation must seek redress in the *forum* of the defendant, unless where such defendant has removed from what was before the common domicil of both. "In a proceeding to dissolve a marriage," says Agnew, J., "the parties stand upon a level of rights; when the injured party seeks a new domicil, and the domicils are, therefore, actually different, there is no greater reason why the husband's new domicil should prevail over the wife's than that hers should prevail over his. In this aspect, justice requires that neither should draw the other within the folds of a foreign jurisdiction." The rule thus established is so reasonable and fair that it must commend itself to every man's innate sense of justice; for surely it needs no argument to prove that no one who has not shut himself out by his own voluntary act of flight from justice should be condemned without a hearing or an opportunity to be heard. Nor did the evidence given of the notice of the pendency of the proceeding, admitting that it was served on the plaintiff, make any difference; for, in the language of the opinion in Colvin *v.* Reed, "back of it lies the want of power of the distant state to subject her to its jurisdiction." Clearly, when it is once determined that a court has not jurisdiction, notice, or even process duly served, cannot give vitality to the judgment it may pronounce. It is null and void, at least, as to any extra-territorial effect. Nor can it alter the case that the title to the land in which the plaintiff claimed her dower, did not vest in John Elder until after the decree was pronounced. At the time it did so vest the plaintiff was his lawful wife, and entitled to her dower after his death, in any lands of which he might be seised at any time during the coverture.

The remaining questions arise from the following language of the charge specified in the 2d assignment of error: "We are of the opinion that, independent of the divorce, the plaintiff, by her course of conduct, is precluded from recovering dower in the present case, and your verdict should be in favor of the defendant."

This instruction took every question of fact from the jury. In this, we think, there was error. Setting aside the Tennessee record, which in this part of his charge the judge excludes from consideration, so far from there being any conclusive evidence, which would justify the court in withdrawing the case from the jury, it was all oral testimony, depending not only on the credit to be given to the witnesses, but on the construction to be put on their language. However clear and indisputable may be the proof when it depends upon oral testimony, it is nevertheless the province of the jury to decide, under instructions from the court, as to the law applicable to the facts, and subject to the salutary power of the court to award a new trial if they should deem the verdict contrary to the weight of the evidence.

But assuming the facts in evidence as all proved, we think the instruction would still be erroneous. It could only have been based upon one of two assumptions of law : either that the adultery proved to have been committed by the plaintiff was a legal bar to her action of dower; or that she was equitably estopped by her acts or declarations from setting up her claim against the defendant.

At common law adultery was no bar of dower; for, says Lord Coke, " It is necessary that the marriage do continue, for if that be dissolved, the dower ceases, *ubi nullum matrimonium, ibi nulla dos.* But this is to be understood where the husband and wife are divorced *à vinculo matrimonii*, as in case of precontract, consanguinity, affinity, &c., and not *a mensa et thoro*, only for adultery :" Co. Litt. 32, a ; 2 West. 435 ; Sir William Grant in Seagrave *v.* Seagrave, 13 Vesey 443 ; Bryan *v.* Bachseller, 6 Rhode Island 546. But the law was changed in this respect by the Statute of Westminister, 13 Edw. 1, st. 1. c. 34 (Rob. Dig. 188), by which it was provided, " that if a wife willingly leave her husband and go away and continue with her avouterer, she shall be barred for ever of action to demand her dower that she ought to have of her husband's lands, if she be convicted thereupon, except that her husband willingly, and without coercion of the church, reconcile her and suffer her to dwell with him ; in which case she shall be restored to action." As well by the express words of this statute as the uniform construction put upon it by the courts, elopement, or, perhaps, to speak more accurately, a voluntary separation, or departure by the wife from her husband, as well as adultery, is necessary to make the bar complete : Co. Litt. 32, b ; 2 Inst. 435. It is true that this elopement need not be with the adulterer, for even where there has been a voluntary separation by mutual agreement the statute applies : Hethrington *v.* Graham, 6 Bing. 135. It is still necessary, however, that she should have separated herself from him *sponte*—willingly. The provision of the statute is comprehended shortly, as Lord Coke tells us, in two hexameters :

[Reel v. Elder.]

Sponte virum mulier fugiens et adultera facta,
Dote sua careat, nisi sponsi sponte retracta.

Green v. Harvey, Roll. Abr. 680; Bacon's Abr., tit. *Dower*, F;
Stegall v. Stegall, 2 Brock. 259; Cogswell v. Tibbetts, 3 New
Hamp. 41; Shaffer v. Richardson, 27 Ind. 122; Walter v. Jordan,
13 Iredell 361; Bell v. Nealy, 1 Bailey (S. C.) 312.　Now there
was not only no evidence that the plaintiff had willingly left her
husband, but the proof was direct, positive, and uncontradicted,
that he had deserted her.　He did not request her to go with him,
nor even inform her of his intention,　He left her clandestinely,
on the false pretence that he was going a-gunning, and was absent
for several years.　His own crime of unfaithfulness to his marriage
vows exposed her to seduction, and that she fell was as much his
fault as hers.　The industry and zeal of the plaintiff's counsel has
found a case in point, decided in the Common Pleas of Upper
Canada (Graham v. Law, 6 Jones 310); but it required no autho-
rity to sustain so plain a position.　This view renders it unneces-
sary to consider the effect of the evidence of final reconciliation
between John Elder and the plaintiff, as it only could become
important if the dower had been barred by force of the statute.

At the time, then, of the execution of the deed to the defendant
for the land, the plaintiff was the lawful wife of John Elder, and
had done nothing to bar her action of dower.　Was there evidence
of anything which ought to work as an equitable estoppel to pre-
vent her maintaining her claim against the defendant?　The prin-
ciple of equitable estoppel is well stated by Lord Chief Justice
Denman, in Pickard v. Sears, 6 Ad. & Ell. 469, that "When one
by his words or conduct wilfully causes another to believe in the
existence of a certain state of things and induces him to act on
that belief, so as to alter his own previous position, the former is
concluded from averring against the latter a different state of
things as existing at the same time:" Commonwealth v. Moltz, 10
Barr 527.　"Estoppels," says Woodward, J., "operate only
between parties and privies, and the party who pleads an estoppel
must be one who was adversely affected by the act which consti-
tutes the estoppel:" Cuttle v. Brockway, 8 Casey 49; Eldred v.
Haslett, Administrator, 9 Id. 307.　We must, therefore, confine
our consideration of the acts and declarations of the plaintiff to
such as had taken place prior to the conveyance to the defendant.
We pass by the question, whether some evidence should not have
been adduced to show that they were known to him and influenced
his conduct.　These facts were simply that the plaintiff had been
living in adultery with, and had a child by, a man named Pickel,
and that they passed as man and wife.　This is the extent of
the testimony of Shaeffer, the only witness who speaks as to a
period prior to the deed.　"I never heard them say they were
married or not married," says he.　Barbara Britenbaugh tes-

[Reel *v*. Elder.]

tifies, indeed "she (the plaintiff) said they were married; they said they had a certificate of marriage. I only heard her say she had a certificate of marriage; said this when she first came." She first came to Campbellstown in the last of March or beginning of April, 1856, which was the only place where the witness knew them. This was after the date of the deed, which was February 2d 1856. These subsequent declarations could not estop the plaintiff; for, in the nature of things, they could not have influenced the defendant in his purchase, and *à fortiori*, the proceedings before Justice Reed can have no such effect, for that proceeding was commenced as late as September 29th 1856. Upon the testimony, then, as returned with this bill of exceptions, it does not appear that there was any evidence to submit to the jury which ought to operate as an estoppel. That the defendant was a bonâ fide purchaser without notice, sufficiently appears, and it is most probable that he was deceived into the belief that the woman with whom John Elder was then living, and who joined in the deed, was his lawful wife; but we see no evidence in the cause that any act or declaration of the plaintiff contributed to produce that deception. That it is no defence to an action of dower that the defendant is a bonâ fide purchaser for value without notice, is a point well settled by the authorities: 2 Scribner on Dower 29, and the cases there cited.

Judgment reversed, and *venire facias de novo* awarded.